JUDGE SCHEINDLIN



MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
BY:  SHARON E. FRASE (SF-4906)
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2329

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :

        - v. -                          :

$1,399,313.74 IN UNITED STATES          :     08 Civ.
CURRENCY, FORMERLY ON DEPOSIT IN
ACCOUNT NUMBER ▮▮▮▮▮3844,              :
IN THE NAME OF IVAN MEJIA CABAL         :
AND CARLOS FERNANDO MEJIA CABAL,
HELD AT HSBC BANK USA, NEW YORK,        :

          Defendant in rem.       :

- - - - - - - - - - - - - - - - - -x

VERIFIED COMPLAINT

      Plaintiff United States of America, by its attorney,

MICHAEL J. GARCIA, United States Attorney for the Southern District

of New York, for its verified complaint alleges, upon information and

belief, as follows:

## I. NATURE OF THE ACTION

      1.   This is an action by the United States of America seeking

forfeiture of $1,399,313.74 in funds formerly on deposit at HSBC Bank

USA, New York, Account No. ▮▮▮▮▮3844, held in the name of Ivan Mejia

Cabal and Carlos Fernando Mejia Cabal (the "Defendant Funds").  The

Defendant Funds are subject to forfeiture pursuant to Sections

981(a)(1)(A) and 984 of Title 18, United States Code, as property

involved in a transaction or attempted transaction in violation of 18

U.S.C. §§ 1956 and 1957.   The Defendant Funds also are subject to forfeiture pursuant to Section 5317 of Title 31, United States Code, as property involved in a transaction structured to evade reporting requirements, in violation of 31 U.S.C. §§ 5313 and 5324, or any conspiracy to commit any such violation, or any property traceable to any such violation or conspiracy.

## II. JURISDICTION AND VENUE

2.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355, and 1395.

3.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of New York, and pursuant to 28 U.S.C. § 1395 because the Defendant Funds were found in the Southern District of New York.

## III. PROBABLE CAUSE FOR FORFEITURE

4.    An investigation regarding the laundering of narcotics proceeds conducted by agents of the United States Drug Enforcement Administration (the "DEA") and other law enforcement agencies has revealed the following:

### Background

5.    The need to launder narcotics dollars arises out of the massive amounts of cash generated by sales of South American drugs -- mostly cocaine and heroin -- in the United States.   These narcotics are sold in the United States for U.S. dollars, almost

always in cash, and often in small denominations.  Reporting and record-keeping requirements mandated by statute and regulation prevent drug dealers from simply depositing those funds into accounts in the United States and transferring them to Colombia or other countries, so drug traffickers must disguise, or "launder," the funds in order to hide their true source.

6.    The Black Market Peso Exchange ("BMPE") is one method used to launder drug money and evade the record-keeping and reporting requirements mandated by law, as well as Latin American foreign exchange and import laws and tariffs.  The basic Colombian BMPE scheme operates as follows.  In Colombia, the owners of the narcotics proceeds generated in the United States contact a third party -- generally referred to as a "peso broker" -- who agrees to provide Colombian pesos he controls in Colombia for the cash narcotics proceeds that the trafficker controls in the United States.  A two-stage exchange is then arranged:  in the United States, the broker's representatives pick up the cash narcotics proceeds -- often hundreds of thousands of U.S. dollars or more at a time -- from the traffickers' representatives; in Colombia, the broker pays the traffickers the corresponding amount (less the broker's commission) in Colombian pesos.  Once this exchange occurs, the traffickers have effectively laundered their money and are out of the BMPE process. The peso broker, on the other hand, must now do something with the U.S. dollars that he has obtained in the United States so that he can

obtain more pesos to begin the process again. In other words, the peso broker, who now has a pool of narcotics-derived funds in the United States, must find persons or businesses willing to buy U.S. dollars for pesos.

7. Colombians who want to buy dollars and who have pesos to sell then make arrangements with the peso broker. A Colombian businessman who needs dollars to fund an offshore investment account, or to pay a U.S. company for goods or services imported into Colombia, for example, might go to a broker to buy dollars instead of the overt Colombian banking system. By doing so, the businessman can get better exchange rates than from the banks and can avoid Colombian currency transaction reporting requirements and paying certain Colombian import and exchange tariffs. Once the businessman pays the broker in pesos, the peso broker will direct that the dollars he has accumulated from the traffickers and put into the banking system be sent, usually by wire transfer, to wherever the sellers want them transferred.

8. All three parties involved in the BMPE process thus benefit: the traffickers receive laundered pesos; the Colombians wishing to buy dollars convert their pesos without reporting or paying taxes and tariffs; and the peso broker makes his profits on the "spread" between the price that the broker buys and sells the dollars.

9. The BMPE process may also involve more than one peso broker. One broker, for example, might have the direct relationship with the cartels in Colombia; another might have the contacts in the

United States who can accumulate the narcotics proceeds; and yet a third might have the contacts with businesspeople or other wealthy Colombians who want dollars and have pesos to sell. Irrespective of how many intermediaries there are, the result is the same: pesos in Colombia are used to buy narcotics proceeds in U.S. dollars.

10. The fact that the Black Market Peso Exchange almost invariably utilizes narcotics proceeds has been widely publicized in Colombia. Any party using BMPE brokers in Colombia thus knows or reasonably should know that there is a substantial likelihood that the dollars they receive as the result of their transactions with peso brokers are the proceeds of narcotics transactions.

11. The peso broker who accumulates the narcotics dollars in the United States must find a way to introduce those dollars into the banking system while avoiding detection by the authorities. One of the well-known methods of achieving this goal is through the practice of making multiple deposits of low-value monetary instruments purchased from banks or other money services businesses to multiple consumer checking and/or savings accounts. This common money laundering scheme, known as "smurfing," takes many forms. Smurfing can be conducted by one or more couriers making deposits to one or more accounts at a bank during several visits. A number of these "smurfs" may arrive at an institution together and go to different tellers, or to different branches, to make deposits to one or more related accounts. These

accounts may be used for a brief period of time before they become dormant.

12. Typically these and other similar kinds of smurfing transactions are below some limit, a limit above which financial institutions must file a report. For example, the Bank Secrecy Act, codified at Title 31, United States Code, Sections 5300 et seq., and the regulations promulgated thereunder, require banking facilities and certain other financial institutions to report any cash transaction over $10,000 by filing a Currency Transaction Report ("CTR"). Banks are also required to file Suspicious Activity Reports ("SARS") to report transactions over a certain amount that they suspect involve money laundering or otherwise violate the Bank Secrecy Act. To avoid these and other reporting requirements, depositors will break up or "structure" larger deposits.

## The Defendant Funds

13. The instant Complaint stems from an investigation begun after officials from HSBC Bank, USA ("HSBC") contacted the Drug Enforcement Administration ("DEA") regarding activity in account number ████3844, held by Ivan Mejia Cabal and Carlos Fernando Mejia Cabal at HSBC in New York, New York (the "Mejia Account").

14. On information and belief, the Mejia Account is a personal savings account that was opened on or about July 11, 2002. The beneficial owners and signatories on the account are Ivan Mejia Cabal ("Ivan Mejia") and Carlos Fernando Mejia Cabal ("Carlos Mejia").

15.   On information and belief, Ivan Mejia resides in Columbia, and managed the day-to-day activities of the account. Carlos Mejia, who resides in Spain, received the monthly statements for the Mejia Account, and was copied on email correspondence between HSBC and Ivan Mejia.

16.   On information and belief, the Mejia Cabal brothers own and operate a business, Industrias de Envases, S.A., located in Columbia, that manufactures containers.

17.   On or about September 10, 2007, Ivan Mejia agreed to a telephone interview with Special Agents from the Drug Enforcement Administration ("DEA") regarding the source of funds in the Mejia Account. During the interviews, which took place over the course of two telephone conversations on September 10, 2007, Ivan Mejia stated the following, in substance:

a.   The Mejia Cabals opened the Mejia Account to save enough money to buy an apartment in New York City. This was the reason why there were no withdrawals.

b.   The Defendant Funds were sent to the Mejia Account by an individual in Cali, Columbia named Oscar Franco Lema ("Lema"). Lema buys Columbian pesos from Cabal in Columbia, and sells Cabal United States dollars.

c.   Lema is well known throughout Cali, Colombia as a U.S. dollars salesman. According to Ivan Mejia, Lema is "famous in Cali

for this type of activity." Ivan Mejia stated that he did not know if Lema was involved in any type of illegal activity.

d.    Lema has a business office located within a mall in the Holguines Trade Center at Torre Valle De LiLi Oficina 708, Carrera 100 #11-90, Cali, Colombia.

e.    Ivan Mejia made monthly purchases of $20,000 from Lema by calling Lema, who would in turn deposit the amount in the Mejia Account.  HSBC would notify Ivan Mejia when the checks were deposited into the account, and then Ivan Mejia would write a personal check to Lema for the equivalent amount of pesos.

f.    Lema sent United States currency to the Mejia Account in the form of checks that originated in the United States. According to Ivan Mejia, Lema only sold United States Dollars by receiving check payments from customers of Lema's "family business" in Columbia.

18.    On or about September 6, 2007 the Government sought and obtained a seizure warrant, authorized by the Honorable Gabriel W. Gorenstein, United States Magistrate Judge, Southern District of New York, for the seizure of all funds on deposit in the Mejia Account.

19.    On or about September 10, 2007, the Government obtained custody of the funds in the Mejia Account as authorized by the warrant. At the time of the seizure, the Mejia Account contained $1,399,313.74.

-8-

## The Account Activity is Indicative of Money Laundering

20.    The pattern of wire transfers and deposits into the Mejia Account prior to the date of the seizure are indicative of black market peso money laundering operations.

21.    On information and belief, the majority of deposits into the Mejia Account since 2002 have been made by Lema or at Lema's direction.  On information and belief, Lema has been operating as a peso exchange broker in Cali, Columbia.

22.    HSBC records show more than $100,000 in wire transfers and checks deposited into the Mejia Account directly from accounts controlled by Lema.  From May 2006 to April 2007, Lema sent for deposit to the Mejia Account eleven checks totaling approximately $47,436 drawn on an account Lema held at Bank of America.  On at least ten occasions between September of 2003 and June of 2006, Lema wired a total of approximately $68,115 to the Mejia Account from banks in Columbia and the United States.

23.    According to Ivan Mejia, these currency exchanges occurred by virtue of a phone call during which Ivan Mejia simply told Lema the amount of United States dollars he wished to purchased, which then resulted in the wiring or mailing of funds in that amount into the HSBC account, without any paperwork or exchange of financial documents, and most significantly, without any prior simultaneous exchange of currency by the Mejia Cabals.

24. On information and belief, accounts held by Lema at other banks have been closed because of suspicious activity in those accounts that is indicative of money laundering activity.

25. In addition, on information and belief, since the Mejia Account was opened, HSBC has received many checks in small denominations drawn on personal checking accounts held by numerous different individuals. The pattern and source of the checks strongly suggests that they came from Lema, were introduced into the banking system through a smurfing scheme, and are the end result of the BMPE process.

26. According to HSBC records, between June 2005 and July 2007, at least 70 third-party checks were mailed to HSBC from Columbia for deposit into the Mejia Account. These checks, which totaled more than $229,000 originated from at least 20 different accounts held at a dozen different banks based in the United States and one in Argentina.

27. Despite the fact that these checks were drawn on accounts with banks based in the United States, the checks arrived from Columbia, via Federal Express, often with multiple checks contained in the shipments. The Federal Express were addressed to HSBC from Lema.

28. The pattern and amount of the funds deposited into the Mejia Account strongly suggests that the Defendant Funds are the result of structuring and similar efforts to evade the filing of CTR's, SARS, and other bank reporting requirements. For example, HSBC received three checks on the same day in May 2007, in the same envelope, from Columbia, for deposit into the Mejia Account. The three checks were purportedly

from three different individuals using two different banks. The first check, dated May 4, 2007 and drawn on an account with Banco Bilbao Vizcaya Argentina ("BBVA"), was written to Cabal for $5,000. A second check, dated May 2, 2007 and drawn on an account with Bank of America, was written to Cabal for 4,000. A third check dated May 7, 2007, and drawn on an account held by Lema at Bank of America, was written to Cabal for $1,000.

29. There were numerous examples during the period between June of 2005 and July of 2007 when HSBC received a package from Lema containing multiple checks to one or both of the Mejia Cabals, with the same date, from the same individual, including the following:

a. Two checks totaling $6,400, both of which were dated August 8, 2006, in the name of Patricia Zuniga, and drawn on an account maintained at Washington Mutual.

b. Two checks totaling $10,000, both of which were dated August 8, 2005, in the name of Gustavo A. Uribe Molina and/or Patricia E. Esguerra Vasquez de Esguerra, and drawn on an account maintained at Ocean Bank.

c. Seven checks totaling $25,000, all of which were dated June 19, 2006, in the name of Arturo Eduardo Rivera Rojas, and drawn on accounts maintained at HSBC and Washington Mutual.

d. Four checks totaling $14,800, all of which were dated August 8, 2006, in the name of Arturo Eduardo Rivera Rojas, and drawn on accounts maintained at HSBC and Washington Mutual.

e.     Three checks totaling $10,000, all of which were dated December 4, 2006, in the name of Arturo Eduardo Rivera Rojas, and drawn on an accounts maintained at HSBC and Washington Mutual.

f.     Three checks totaling $11,000, all of which were dated January 31, 2007, in the name of Fabio Gaviria and/or Beatriz Gavira, and drawn on an account maintained at Bank of America.

g.     Two checks totaling $10,000, both of which were dated February 6, 2006, in the name of Herman Bernal Vargas and/or Maria Patricia Bernal, and drawn on an account maintained at Washington Mututal.

h.     Two checks totaling $10,000, both of which were dated February 6, 2006, in the name of Hilda V. DePalau and/or Jorge Palua, and drawn on an account maintained at Merril Lynch.

i.     Two checks totaling $10,000, both of which were dated May 16, 2006, in the name of Hilda V. DePalau and/or Jorge Palau, and drawn on an account maintained at Merril Lynch.

j.     Two checks totaling $7,000, both of which were dated February 5, 2006, in the name of Jairo Cabal and/or Maria Pilar Soto, and drawn on an account maintained at Nations Bank.

k.     Three checks totaling $20,000, all of which were dated with the same date in 2007, in the name of Julia C. Camacho and/or Rosabed Mancholo de Camacho, and drawn on an account maintained at RBC Centura Bank.

30.   Of the individuals in the accounts described above, the investigation thus far has been unable to link any of them to the business activities either of Lema or the Mejia Cabals.

31.   In sum, the pattern of multiple deposits of small amounts of funds from different U.S.-based bank accounts into the Mejia Account strongly suggests that the Defendant Funds were introduced into the banking system in structured amounts, by means of a smurfing operation or similar scheme, and laundered through the BMPE process.

32.   Ivan Mejia's own statements provide further evidence that all or substantially all of the Defendant Funds are the end result of smurfing and of the BMPE process.   During three telephone calls on or about August 8, 2007, an account manager at HSBC spoke to Ivan Mejia about the activity in the Mejia Account.   These calls were recorded by HSBC.   Ivan Mejia told the account manager, in substance, that the checks being deposited into the Cabral Account were for foreign exchange transactions in which U.S. Dollars were being exchanged for Columbian pesos.   During the August 8, 2007 conversations, Ivan Cabal discussed with the HSBC representative the disposition of checks from Lema that HSBC had recently received.   Ivan Mejia asked that HSBC not void the checks and instead return the checks to Lema.   He also asked that any additional checks HSBC receives from Lema be returned to Lema.

IV. <u>CLAIM FOR FORFEITURE</u>

33.   Incorporated herein are the allegations contained in paragraphs one through thirty-two of the Verified Complaint.

**<u>Sections 981(a)(1)(A) and 1956</u>**

34.   Title 18, United States Code, § 981(a)(1)(A) subjects to forfeiture "[a]ny property real or personal involved in a transaction or attempted transaction in violation of . . . section 1956 . . . of this title, or any property traceable to such property."

35.   Title 18, United States Code, § 1956(a) provides:

(a)(1) [w]hoever knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity −

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of Section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part -- (i) to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity; or to avoid a transaction reporting requirement under State or Federal law.

36.   A "financial transaction," as defined by 18 U.S.C. § 1956(c)(4), includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . ."

-14-

37.  "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense under 18 U.S.C. § 1961(1). Section 1961(1) lists as an offense "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States." Section 1961(1) also lists as an offense violations of 18 U.S.C. § 1956, relating to the laundering of monetary instruments.

38.  Because the Defendant Funds relate to the concealment and laundering of narcotics proceeds, such funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as they represent property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 1956(a)(1)(B)(ii), and property traceable to such property.

### Sections 981(a)(1)(A) and 1957

39.  Title 18, United States Code, § 981(a)(1)(A) subjects to forfeiture to the United States "[a]ny property real or personal involved in a transaction or attempted transaction in violation of . . . section 1957 . . . of this title, or any property traceable to such property."

40.  Title 18, United States Code, § 1957 provides, in pertinent part:

> (a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000

and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

\* \* \*

(d) The circumstances referred to in subsection (a) are --

(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States . . . .

41. "Monetary transactions" is defined in 18 U.S.C. § 1957(f)(1) as the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce of funds . . . by, through, or to a financial institution . . . including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . ."

42. "Criminally derived property" is defined in 18 U.S.C. § 1957(f)(2) as "any property constituting, or derived from, proceeds obtained from a criminal offense."

43. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense under 18 U.S.C. § 1961(1). Section 1961(1) lists as an offense "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States." Section 1961(1) also lists as an offense violations of 18 U.S.C. § 1956, relating to the laundering of monetary instruments.

-16-

44.   Because the Defendant Funds constitute criminally derived property derived from narcotics trafficking and the laundering of monetary instruments, exceed $10,000, and were involved in a monetary transaction, such funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as they represent property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, and property traceable to such property.

**Section 984 of Title 18 of the United States Code**

45.   Section 984 of Title 18 of the United States Code provides, in pertinent part:

> (a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals--
>
> > (A)   it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
> >
> > (B)   it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.
>
> (2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.
>
> (b) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.
>
> (c)(1) Subsection (a) does not apply to an action against funds held by a financial institution in an interbank account unless the account holder

knowingly engaged in the offense that is the basis
for the forfeiture.

        \*       \*       \*

(d) Nothing in this section may be construed to
limit the ability of the Government to forfeit
property under any provision of law if the property
involved in the offense giving rise to the
forfeiture or property traceable thereto is
available for forfeiture.

46.    In substance, among other things, this provision permits
the Government to seize and forfeit funds in a bank account into which
forfeitable assets have been transferred within one year, without the
necessity of showing that the specific funds now in the account
themselves constitute the forfeitable funds.  In other words, "tracing"
of the funds in the account now to the forfeitable funds that were
transferred into the account is not required for transfers within one
year of the seizure.

## Section 5317(c) of Title 31

47.    Section 5317(c) of Title 31, United States Code,
subjects to seizure and forfeiture "[a]ny property involved in a
violation of section 5313, 5316, or 5324 of this title, or any
conspiracy to commit any such violation, and any property traceable to
any such violation or conspiracy[.]"

48.    Section 5313 of Title 31, United States Code, mandates
reports by financial institutions on domestic coins and currency
transactions.

49.    Under 31 U.S.C. § 5324(a):

No person shall, for the purpose of evading the
reporting requirements of section 5313(a) or 5325

-18-

or any regulation prescribed under any such section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508--

\*\*\*
(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

50. Because the Defendant Funds are involved in transactions structured to evade reporting requirements, such funds are subject to forfeiture pursuant to 31 U.S.C. § 5317(a), as property involved in a violation of section 5313, 5316, or 5324 of Title 31, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy.

51. By reason of the above, the Defendant Funds are subject to forfeiture to the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 984; and 31 U.S.C. § 5317(c).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Funds and that all persons having an interest in the Defendant Funds be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Funds to the United States of America for

disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
       February 27, 2008

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By: _____
SHARON E. FRASE (SF-4906)
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Telephone: (212)637-2329

<u>VERIFICATION</u>

STATE OF NEW YORK                    )

COUNTY OF NEW YORK                   :

SOUTHERN DISTRICT OF NEW YORK        )


      JOSEPH G. CATALANO, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration, and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information and belief.

      The sources of deponent's information and the grounds of his  belief are from official records and files of the United States Government, and information obtained directly by deponent during an investigation of alleged violations of Titles 18 and 21, United States Code.

                                   JOSEPH G. CATALANO
                                   Special Agent
                                   Drug Enforcement

Administration

Sworn to before me this
27th day of February, 2008

_____
NOTARY PUBLIC

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires _May 8, 2010_

-19-