UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>v.<br><br>$1,399,313.74 IN UNITED STATES CURRENCY, FORMERLY ON DEPOSIT IN ACCOUNT NO. _____3844, IN THE NAME OF IVAN MEJIA CABAL AND CARLOS FERNANDO MEJIA CABAL, HELD AT HSBC BANK USA, NEW YORK<br><br>             Defendant *in rem*. | Civil case no. 08-CV-01993 (SAS)<br>Judge Scheindlin, U.S.D.J. |

**CLAIMANTS IVÁN FELIPE MEJÍA CABAL AND CARLOS FERNANDO MEJÍA CABAL'S <u>REPLY</u> IN SUPPORT OF THE MOTION TO DISMISS THE VERIFIED COMPLAINT**

Alan Silber
WALDER, HAYDEN & BROGAN, P.A.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 992-5300
asilber@whbesqs.com
**Attorneys for Claimants**

**On the Brief:**
    Ed Licitra (admitted pro hac vice)
    Alan S. Fine (admitted pro hac vice)
    Fine & Licitra LLP

# TABLE OF CONTENTS

**I. Introduction** ............................................................................................................... 1

**II. Standard on a Motion to Dismiss** ...................................................................... 1

**III. The Complaint Does Not Allege Facts Sufficient to Support the Government's Claim for Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(a) or 31 U.S.C. 5317(c)**
(Reply to Memorandum in Opposition Points IB and IC) ............................................ 2

**IV. The Government's Case Law Does Not Support Denial of the Motion to Dismiss** ......... 7

**V.   No Response to Claimants' Arguments Regarding 18 U.S.C. § 984** ............................. 9

**VI. Conclusion** ............................................................................................................. 9

i

## I. Introduction

The Memorandum in Opposition (Memorandum) first engages in 15 pages of throat-clearing, then argues for the sufficiency of the Complaint by attempting to spin what is actually stated in the Complaint - attempting to accomplish by characterization what it most certainly did not accomplish by allegation. The Memorandum offers no valid reason to deny the Motion to Dismiss.

## II. Standard on a Motion to Dismiss

The Government agrees with Claimants that Supplemental Admiralty Rule G governs the instant civil forfeiture complaint, and that this rule requires the Government to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." (Mem. Opp'n at 12)

However, the Government also invokes a standard that has been specifically *disapproved* by the United States Supreme Court – "[t]he Complaint should not be dismissed unless it appears that a plaintiff cannot prove any facts in support of its claim that would entitle it to relief." (Mem. Opp'n at 11) In *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), the high court identified the problem with this standard, and specifically indicated that it should be put out to pasture because if applied in isolation, "a wholly conclusory statement of claim would survive a motion to dismiss." *Id.* at 1968, 1969. To state a claim adequately, the Supreme Court requires factual allegations sufficient "to raise a right to relief above the speculative level". *Id.* at 1965. This general standard is of course heightened in forfeiture cases by the "detailed facts" requirement in Admiralty Rule G(2)(f).

Because the Government's ultimate burden of proof requires it to *establish a substantial connection between the property and the offense*[1], it stands to reason that in pleading it must allege *a substantial connection between the property and the offense* to support a reasonable belief that it will prevail at trial.

The Government also points out that a complaint cannot be dismissed on the ground that the Government did not have adequate evidence at the time it was filed to establish that the property is forfeitable. (Mem. Opp'n at 13, *citing to* 18 U.S.C. § 983(a)(3)(D)). The Motion to Dismiss is not based on the quantum of evidence in the Government's possession when it filed, it is based on the utter lack of detailed *factual allegations* in the Complaint showing a connection between the Defendant Funds and violations of the criminal statutes invoked by the Government.

Moreover, both Admiralty Rule G(2)(f) and *Bell Atlantic Corp.*, *supra*, make it clear that the Government cannot use the "adequate evidence at the time it was filed" standard of 18 U.S.C. § 983(a)(3)(D) to justify filing a complaint on suspicion alone, in the hope that some nugget will be obtained fortuitously in discovery that will justify having filed in the first place.

### III. The Complaint Does Not Allege Facts Sufficient to Support the Government's Claim for Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(a) or 31 U.S.C. 5317(c)
(Reply to Memorandum in Opposition Points IB and IC)

The Complaint appears to postulate two bases for forfeiture: (1) because the Claimants obtained their dollars from a currency exchanger outside the banking system, the Funds must be deemed dirty (even though there is no allegation connecting any of the dollars to any drug trafficking or money laundering operations)[2]; and, (2) although the Government does not allege

---

[1]    18 U.S.C. § 983(c)(3).

[2]    To the best of the undersigned attorneys' knowledge this is an absolutely novel theory and a considerable stretch from prior forfeiture actions involving currency exchangers, in which the key assertion was that certain (or all) funds obtained by the currency exchanger could be traced to criminal activity.

2

the occurrence of any structuring of deposits into the Mejía Account, it alleges a basis to suspect that deposits may have been structured into the source accounts from which funds were transferred to the Mejía Account ("the Source Accounts"). (*See* Mot. Dismiss at 10-12, and portions of the Complaint referred to therein.) The purported factual allegations supporting these theories are addressed in Sections IB and IC of the Memorandum.

With regard to theory (1), the Memorandum at page 18 makes the grandiose claim that the Complaint contains "numerous allegations" that what the Claimants purchased were "in fact drug dollars purchased on the black market. (Compl. ¶¶ 10, 20, 31, 38, 44)." As a review of the purportedly supporting paragraphs shows, this assertion is nothing more than an attempt to enhance an inconvenient reality through favorable characterization.[3]

Paragraph 10 of the Complaint makes general assertions about the "Black Market Peso Exchange". Paragraph 20 includes an allegation that the pattern of deposits into the Mejia Account is "indicative of" criminal activity - this is the language of mere suspicion not an allegation of criminal activity. Paragraph 31 (the pattern of deposits into the Mejía Account "strongly suggests" smurfing into the Source Accounts) also states only a basis for suspicion, but does not allege that any smurfing actually occurred. Paragraphs 38 and 44 are merely conclusory allegations with no basis in alleged fact. The collective effect is a kind of rhetorical sleight-of-hand: identify reasons to *suspect* the existence of a connection between the property and

---

[3] Or in the inelegant phrase associated with publicists and advertisers, "put some lipstick on this pig".

3

criminal activity, then summarize as if the mere suggestion of a *possible* connection had been an outright assertion.[4]

Assertions that Franco Lema was a non-institutional currency exchanger, and that *other* non-institutional currency exchangers trade in drug money (but it cannot be alleged that Franco Lema did), fail to allege even an insubstantial connection between the Defendant Funds and a criminal offense. They certainly provide no basis for a reasonable inference that any of the Defendant Funds are derived from drug trafficking. Nothing in the Memorandum negates the Claimants' point that there is no factual allegation in the Complaint connecting any Funds with drug trafficking. Moreover, there is no allegation that merely dealing with a non-institutional currency exchanger constitutes a crime in the absence of any allegations connecting the Funds with a crime.

With regard to the alleged structuring into the Source Accounts (theory (2) above), the Memorandum includes several overheated characterizations of what is purportedly alleged in the Complaint. *See, e.g.,* p. 17 (Franco Lema "caused deposits" into the Mejía Account "in such a way as to help conceal the illicit origin of the funds" and "engaged in 'smurfing'"); p. 19 ("detailed money laundering allegations that describe the process by which Lema took funds inserted into the U.S. banking system through 'smurfing' and distributed them to the HSBC Account"); p. 20 ("the defendant-in-rem funds deposited into the HSBC Account are the proceeds of or traceable to proceeds of transactions that were structured").

Next to these vigorous assertions, the actual allegations in the Complaint which purportedly support them (primarily paragraphs 20-32) are decidedly effete.

---

[4] The recurring "indicative of" and "strongly suggests" allegations in the Complaint (¶¶ 20, 25, 28, 31) "strongly suggests" that this phrasing was calculated to avoid Rule 11 violations in light of the evidence actually in the Government's possession.

4

Paragraphs 20-30 merely describe numerous deposits into the Mejía Account, followed by an assertion (¶ 31, quoted at page 11 of the Motion to Dismiss) that the pattern of deposits "strongly suggests" that funds flowing into the Mejía Account were smurfed into the Source Accounts. It is unclear whether this means that the Government did not bother to investigate the Source Accounts (which it could readily identify from HSBC's records) in the more than half year it had to investigate, or whether its investigation revealed no indication of structuring. In either case, the "strongly suggests" allegation affords no basis for a reasonable belief that the Government will be able to carry its burden of proof at trial.

In fact, the Complaint includes *no* factual allegations about deposits into the Source Accounts – not even whether any were made in cash. For the Government to now assert that it has made detailed factual allegations of structuring into the Source Accounts argues much more convincingly for the Government's desperation than it does for the sufficiency of its Complaint.

At page 21, the Memorandum states that the Claimants make a "misplaced" assertion by arguing that the Complaint merely speculates that the Defendant Funds may have been involved in the commission of a crime. There is nothing misplaced about the Claimants' position that a complaint based on nothing more than statements of suspicion and conclusory allegations "that the funds are forfeitable on this basis", such as the Government has filed in the instant case, is legally insufficient.

If this were not the case, the Government would be free to hold private property hostage by seizing it, filing a claim for its forfeiture based on stated suspicion (whether actual or not), and forcing the owners to litigate (rolling the dice on a favorable fee award at the end of the day) or negotiate in order to get at least some portion of their property back – when the Government

5

had no factual basis for a forfeiture in the first place.[5] The pleading requirements in Admiralty Rule G must, at a minimum, be understood in a way that does not permit forfeiture proceedings to become a vehicle for state-sanctioned extortion, whether it results from misplaced aggressiveness, political pressures[6], conviction that outstrips its evidentiary foundations, or any other motivation. *See United States v. $38,000.00 in U.S. Currency*, 816 F.2d 1538, 1547 (11th Cir. 1987), and cases cited therein (forfeitures are not favored in the law; strict compliance with the letter of the law by those seeking forfeiture must be required).

The final point made in Section IC of the Memorandum works to support, not defeat, the Motion to Dismiss. At pages 21 and 22, the Government argues that notwithstanding Claimants' assertions that checks cannot be the subject of reporting requirements, they can be if they are endorsed in blank and thus qualify as "monetary instruments" - and "discovery may reveal that Lema instructed the nominal U.S. account holders to send him signed checks that left the payee blank". "Discovery may reveal" is not an argument for the sufficiency of the Complaint. Instead, it crystallizes how the Government is proceeding here: sue for the forfeiture of $1.4 million on suspicion, and hope discovery turns up something justifying that suspicion.

---

[5]   As has happened in this case. After seizing the Defendant Funds in early September, 2007, the Government did not provide formal notice of the seizure within 90 days as it is statutorily obligated to do. Claimants notified the Government of the problem, and demanded that it comply with its statutory obligation to return the funds pursuant to 18 U.S.C § 983(a)(1)(F). The Government did not comply, but did invite the Claimants on more than one occasion to negotiate for the return of some fraction of their funds.

[6]   *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 56 n.2 (1993) (quoting from memorandum from Attorney General to U.S. Attorneys urging them to increase volume of forfeitures in order to meet Department of Justice's annual budget target and avoid "undermin[ing] confidence in our budget projections"). Claimants can only speculate as to whether similar pressures might exist in light of the current federal budgetary situation – particularly where the property at issue belongs to persons with no voting voice in this country.

There are countries where governments can conduct lawsuits in this fashion. Ours should not be one.

## IV. <u>The Government's Case Law Does Not Support Denial of the Motion to Dismiss</u>

The case law relied on by the Government does not help it overcome the lack of detailed factual allegations connecting the Defendant Funds to criminal activity. First, of the Government's main cases[7] only *Dime Savings*, (Mem. Opp'n at 19), is a CAFRA case. The others were decided under no-longer operative procedural rules that were considerably more favorable to the Government, including that a complaint must show "only as much detail as is necessary to reasonably infer an ability to show probable cause at trial." *$15,270,885.69* at *2. Moreover, the other cases rely on the now-discredited "no set of facts" standard discussed in Section II *supra*. *Id.*; *$15,270,885.69* at *1; *$81,990.47* at *1; *$25,829,681.80* at *5. The fact that the complaints in these cases were found sufficient under the old rules gives us no guidance as to their sufficiency under current standards.

Moreover, none of the Government's cases is factually analogous to the instant case. In *Dime Savings*, the crime warranting forfeiture had already been admitted to by the claimant's husband, who had forfeited his interest in all the properties that were the subject of the civil forfeiture action. *Id.* at 58-59. The only issue was whether the Government should be precluded from amending its complaint where the proposed amendment did not lay out the Government's proof that the defendant properties constituted the fruits of that crime. In the instant case, the problem is much more fundamental – there is no detailed factual allegation connecting the Defendant Funds to a crime. The minimal allegations that the Government must make to earn the right to proceed with a lawsuit simply have not been made.

---

[7] *Dime Savings; $15,270,885.69* (Mem. Opp'n. at 19, 23); *$81,990.47 (Id.* at 20); and *$25,829,681.80 (Id.* at 23).

7

In *$15,270,885.69*, the court merely found in conclusory fashion that the complaint was sufficient without analysis, making it impossible to analogize from that case to this one.

In *$81,990.47*, the fact that the claimants owned both an account that received numerous cash deposits of $9,500 and a second account which commingled funds with the first was key to the court's finding that the complaint adequately stated a claim against both accounts for violation of the currency transaction reporting laws. In the instant case, there are no allegations that structured deposits were made into the Mejía Account, and no allegations that Claimants controlled the source accounts and commingled funds between the two.

In *$25,829,681.80*, the court concluded that the claimant's involvement in a wire fraud could easily be inferred from allegations that: the funds of the defrauded investors were sent to her account, not invested; she withdrew over $1.8 million; and when the fraudfeasors had occasion to fear the game was up she promptly attempted to withdraw the balance. *Id.* at *7.

Here, the Government cannot even define what inference it is seeking, throwing the entire mishmash of allegations in the Complaint at the Court in the hope that it can find and articulate a specific reasonable inference where the Government cannot:

> the Government has alleged specific facts supporting an inference that the defendant-in-rem is traceable to an offense constituting "specified unlawful activity", be it money laundering, narcotics violations, or evasion of reporting requirements . . . .

(Mem. Opp'n at 23)[8]

---

[8] To the extent the Government seeks an inference that because Franco Lema is a non-institutional currency exchanger, he must have provided tainted funds, it finds itself in a Catch-22. For the inference to be reasonable, the Government would have to first assert that *all* the dollars provided by all non-institutional currency exchangers in Colombia are tainted. But it cannot in good faith make that general assertion because it has no basis for alleging that Franco Lema provided tainted funds in this case. What the Government is left with is the "fractured syllogism" described at pages 8-9 of the Motion to Dismiss.

8

Also worthy of mention is *United States v. Medina Cuartes*, 155 F. Supp. 2d 1338 (S.D. Fla. 2001) (Mem. Opp'n at 18). The Government's parenthetical summary of this case can easily be misread to say that dollars purchased from non-institutional currency exchangers such as Franco are subject to forfeiture. The opinion says no such thing. The basis for forfeiture in *Medina Cuartes* was that dollars entering the claimant's account were traceable to an account associated with a conspiracy to commit money laundering. For that reason, *Medina Cuartes* supports the observation made at page 6 of the Motion to Dismiss that in the typical forfeiture case involving a currency exchange intermediary, the Government can trace specific funds that went into the subject account to identifiable money laundering activity – something the Government has *not* done in this case.

### V. No Response to Claimants' Arguments Regarding 18 U.S.C. § 984

Although the Claimants dedicated one section of their Motion to Dismiss to the Government's apparently misplaced reliance on 18 U.S.C. § 984, the Government has chosen to say nothing in its Memorandum in Opposition explaining or defending its reliance on that statute. By its silence, the Government tacitly acknowledges the correctness of Claimants' arguments on this point.

### VI. Conclusion

In *Bell Atlantic Corp. v. Twombly*, the Supreme Court states that the "no set of facts standard" should be put to rest because if it is applied in isolation,

> a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. *See* pt. II, *supra*.

That is exactly the situation here. The instant Complaint does not allege facts which, if proven, would make a *prima facie* case for forfeiture of the Defendant Funds. Sufficiently detailed facts

9

supporting a reasonable belief that the Government would be able to meet its burden of proof at trial are simply not there. If such allegations were actually in the Complaint, the Government would have had no need to resort to the sad parade of argumentative tactics on display in its Memorandum: characterizations that misrepresent what is actually alleged in the Complaint; reliance on case law decided pursuant to no-longer-viable standards that were more favorable to the Government than is current law; use of the "adequate evidence at the time it was filed" standard to attempt to justify filing a complaint on suspicion and filling in the blanks later.

What the Memorandum implicitly asks the Court to do is treat the "sufficiently detailed facts" requirement in Admiralty Rule G(2)(f) not as a checkpoint where only the properly-credentialed are admitted, but as a nod-and-a-wink gateway where those wearing the right uniform are waved on through with a benign smile. If the forfeiture pleading requirements have any meaning, they must be applied to bar an inherently abusive action like this in which the Government cannot even *allege* facts showing a substantial connection between the Defendant Funds and a crime warranting forfeiture.

Lastly, leave to amend should be denied because there is no indication that the Government can cure the fundamental defect here – the lack of factual support for the boilerplate allegations that the Defendant Funds are associated with crimes.

Respectfully submitted,

s/Alan Silber
Alan Silber (AS 2370)
Attorney for Claimants Iván Felipe Mejía Cabal
and Carlos Fernando Mejía Cabal

WALDER, HAYDEN & BROGAN, P.A.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 992 5300
asilber@whbesqs.com

10