## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA, | Civil case no. 08-CV-01993 (SAS) |
|---|---|
| Plaintiff, | Judge Scheindlin, U.S.D.J. |
| v. | |
| $1,399,313.74 IN UNITED STATES CURRENCY, FORMERLY ON DEPOSIT IN ACCOUNT NO. _____3844, IN THE NAME OF IVAN MEJIA CABAL AND CARLOS FERNANDO MEJIA CABAL, HELD AT HSBC BANK USA,NEW YORK | |
| Defendant *in rem*. | |

---

## CLAIMANTS IVÁN FELIPE MEJÍA CABAL AND CARLOS FERNANDO MEJÍA CABAL'S MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS THE AMENDED VERIFIED COMPLAINT

---

Alan Silber (AS 2370)
**WALDER, HAYDEN & BROGAN, P.A.**
**5 Becker Farm Road**
**Roseland, New Jersey 07068**
**(973) 992-5300**
**asilber@whbesqs.com**
**Attorneys for Claimants**

On the Brief:
Ed Licitra (admitted pro hac vice)
Fine & Licitra LLC

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

I.   Introduction ............................................................................................................ 1

II.  Legal standards applicable to this Motion .......................................................... 1

III. Legal Bases for Forfeiture Asserted by the Government ................................... 3

   18 U.S.C. § 1956 .................................................................................................. 3

   18 U.S.C. § 1957 .................................................................................................. 4

   18 U.S.C. § 1960 .................................................................................................. 4

   31 U.S.C. § 5317(c) ............................................................................................. 5

   Summary ............................................................................................................... 5

IV. Detailed facts alleged – what the Complaint says, and what it does not .......... 6

   A.      Narcotics trafficking ................................................................................. 6

       Money Laundering.......................................................................................... 10

       Structuring of deposits ................................................................................... 12

       Illegal Money Transmitter ............................................................................. 15

## TABLE OF AUTHORITIES

**CASES**

Bell Atlantic Corp. v. Twombley,
  127 S. Ct. 1955 (2007)................................................................................................ 1

United States v. $3,500 in U.S. Currency,
  2008 WL 215807 (E.D.N.C. Jan. 24, 2008) ............................................................... 2

United States v. $38,000.00 in U.S. Currency,
  816 F.2d 1538 (11th Cir. 1987) .................................................................................. 3

United States v. All Funds on Deposit in Dime Savings Bank of Willamsburg Account
  No. 58-400738-1 in the Name of Ishar Abdi and Barbara Abdi,
  255 F. Supp. 2d 56 (E.D.N.Y. 2003) .......................................................................... 2

United States v. Certain Accounts, Together with All Monies on Deposit Therein,
  795 F. Supp. 391 (S.D. Fla. 1992) .............................................................................. 2

United States v. Mondragon,
  313 F.3d 862 (4th Cir. 2002) ...................................................................................... 2

**STATUTES**

18 U.S.C. § 1956........................................................................................................... 3

18 U.S.C. § 1957....................................................................................................... 3, 4

18 U.S.C. § 1960.................................................................................................. 3, 4, 17

18 U.S.C. § 1960(b)(1) ......................................................................................... 16, 17

18 U.S.C. § 1960(b)(1)(A) ......................................................................................... 17

18 U.S.C. § 1960(b)(1)(B) ......................................................................................... 17

18 U.S.C. § 1960(b)(2) ............................................................................................... 17

18 U.S.C. § 983(c)(1).................................................................................................... 2

18 U.S.C. § 983(c)(3).................................................................................................... 2

31 U.S.C. § 5313 .......................................................................................................... 5

31 U.S.C. § 5316 .......................................................................................................... 5

31 U.S.C. § 5317(c) .................................................................................................. 3, 5

31 U.S.C. § 5324.......................................................................................................... 5

31 U.S.C. § 5330................................................................................................ 5, 16, 17

Fl. S.A. § 560.102(1) .................................................................................................. 17

Fl. S.A. § 560.125(1) .................................................................................................. 17

**RULES**

Federal Rules of Civil Procedure 12(b)(6) ..................................................................... 1

Federal Rules of Civil Procedure 15 ............................................................................. 1

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture
    Actions G ............................................................................................................. 1

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture
    Actions G(2)(f) ........................................................................................... 1, 2, 11

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture
    Actions G(5)(b) ................................................................................................... 1

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture
    Actions G(8)(b)(i) .............................................................................................. 1

**REGULATIONS**

31 C.F.R. 103.22(b) ...................................................................................................... 14

Claimants IVÁN FELIPE MEJÍA CABAL and CARLOS FERNANDO MEJÍA CABAL,

pursuant to Federal Rules of Civil Procedure 12(b)(6) and 15 and Rules G(5)(b) and G(8)(b)(i),

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, hereby

move for an order dismissing the instant Amended Verified Complaint, and state:

## I. <u>Introduction</u>

The instant Verified Complaint for civil forfeiture ("Complaint") is dismissible because –

like its predecessor - it does not allege sufficient facts to state a claim.

## II. <u>Legal standards applicable to this Motion</u>

The Supreme Court has articulated the principles applicable to motions for 12(b)(6) as

follows:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.

<u>Bell Atlantic Corp. v. Twombley</u>, 127 S. Ct. 1955, 1959 (2007).

That standard is heightened in civil forfeiture cases, in which the complaint <u>does</u> need

detailed factual allegations.  Rule G, Supplemental Rules for Admiralty or Maritime Claims and

Asset Forfeiture Actions, governs civil forfeiture actions *in rem* that arise, as does the instant

case, from federal statutes.  Rule G(2)(f) requires that a civil forfeiture complaint must "state

sufficiently *detailed facts* to support a reasonable belief that the government will be able to meet its burden of proof at trial" [emphasis added].[1]

The Government's burden of proof at trial is that it "establish, by a preponderance of the evidence that the property is subject to forfeiture". 18 U.S.C. § 983(c)(1). Where, as here, the Government's theory is that the property was used or involved in the commission of, or to facilitate, a criminal offense, "the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

The Government cannot seize and continue to hold property upon conclusory allegations that the property is forfeitable. United States v. All Funds on Deposit in Dime Savings Bank of Willamsburg Account No. 58-400738-1 in the Name of Ishar Abdi and Barbara Abdi, 255 F. Supp. 2d 56, 69 (E.D.N.Y. 2003), citing United States v. Certain Accounts, Together with All Monies on Deposit Therein, 795 F. Supp. 391, 394 (S.D. Fla. 1992); see United States v. $3,500 in U.S. Currency, 2008 WL 215807 (E.D.N.C. Jan. 24, 2008) (where complaint alleged amount of money seized, location of seizure, present location of funds, and that funds were used, intended to be used or represented proceeds of narcotics trafficking, "these paltry allegations do not come near to satisfying" Rule G(2)(f) requirements).

To meet the Admiralty Rule G(2)(f) standard in light of 18 U.S.C. § 983(c)(3), the *facts alleged* must show a connection between the property seized and the alleged crimes for which forfeiture is sought. United States v. Mondragon, 313 F.3d 862, 865-66 (4th Cir. 2002) (allegations that currency was seized, how it was packaged, and when, where and by whom it

---

[1]    Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions was added in 2006 and, pursuant to subsection (1) thereof, governs forfeiture actions *in rem* arising from federal statutes, such as the instant case. Subsection G(1) also states that Admiralty Rules C and E apply "[t]o the extent that these rules do not address an issue". Because Rule G(2) specifically addresses the requirements for forfeiture complaints, it supersedes Admiralty Rule E(2)(a) on that subject.

was seized would be insufficient to plead connection between currency and drug trafficking under standard that complaint must allege sufficient facts to support reasonable belief that property is subject to forfeiture).

Forfeitures are not favored in the law; strict compliance with the letter of the law by those seeking forfeiture must be required. United States v. $38,000.00 in U.S. Currency, 816 F.2d 1538, 1547 (11th Cir. 1987), and cases cited therein.

### III. Legal Bases for Forfeiture Asserted by the Government

The Amended Complaint, like the original Complaint, seeks forfeiture of the Defendant Funds pursuant to four federal statutes (and the statutes referred to therein). Three of the bases now asserted for forfeiture are the same as in the original Complaint: violations of 18 U.S.C. §§ 1956 and 1957, and 31 U.S.C. § 5317(c). The newly added claim asserts a violation of 18 U.S.C. § 1960.

**18 U.S.C. § 1956**

The first claimed basis for forfeiture is that the Defendant Funds are property involved in a transaction in violation of 18 U.S.C. § 1956 – that is, a financial transaction designed

> (i) to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law.

Am. Complaint ¶¶ 43-45.

> The Government alleges that forfeiture is warranted under this provision

> [b]ecause the Defendant Funds were involved in and traceable to financial transactions or attempted transactions (a) used to promote narcotics trafficking and money laundering offenses . . .; (b) used to conceal or disguise the source, location, ownership, nature, or control of drug trafficking proceeds and laundered funds . . .; and (c) structured with the intent to evade bank reporting requirements . . . .

3

Am. Complaint ¶ 46.

**18 U.S.C. § 1957**

The second claimed basis for forfeiture is that the Defendant Funds are property involved

in a transaction in violation of 18 U.S.C. § 1957 – that is, a transaction

> in criminally derived property of a value greater than $10,000 and
> is derived from specified unlawful activity

where

> the offense under this section takes place in the United States.

Am. Complaint ¶¶ 49-51.

The Government alleges that forfeiture is warranted under this provision

> [b]ecause the Defendant Funds constitute criminally derived
> property derived from the laundering of monetary instruments,
> structuring, the operation of an unlicensed money remittance
> business, narcotics trafficking, and because the Defendant Funds
> exceed $10,000, and were involved in a monetary transaction. . . .

Am. Complaint ¶ 53.

**18 U.S.C. § 1960**

The third claimed basis for forfeiture is that the Defendant Funds are property involved in

a violation of 18 U.S.C. § 1960 which provides that "[w]hoever knowingly conducts, controls,

manages, supervises, directs, or owns all or part of an unlicensed money transmitting business"

shall face criminal penalties. Am. Complaint ¶ 56.

The Government alleges that forfeiture is warranted under this provision because the

currency exchanger used by the Claimants, Oscar Franco Lema,

> knowingly conducts, controls, manages, supervises, directs, and
> owns all or part of an unlicensed money transmitting business that
> affects interstate and foreign commerce and that (a) operates
> without an appropriate money transmitting license in a State where

4

> such operation is punishable as a misdemeanor or a felony under
> State law; (b) fails to comply with the money transmitting business
> registration requirements under section 5330 of title 31, United
> States Code, or regulations prescribed under such section; and (c)
> otherwise involves the transportation or transmission of funds that
> are known to Franco to be derived from a criminal offense or are
> intended to be used to promote or support unlawful activity.

Am. Complaint ¶ 58.

### 31 U.S.C. § 5317(c)

The fourth and final claimed basis for forfeiture is that the Defendant Funds are forfeitable pursuant to 31 U.S.C. § 5317(c) because they are involved in violations of 31 U.S.C. §§ 5313, 5316, or 5324. Am. Complaint ¶ 61.

Specifically, the Complaint points out that 31 U.S.C. § 5313 "mandates reports by financial institutions on domestic coins and currency transactions"; that 31 U.S.C. § 5316 "mandates reports on exporting and importing of monetary instruments"; and that 31 U.S.C. § 5324 "prohibits structuring transactions to evade reporting requirements". Am. Complaint ¶ 62.

The Government alleges that forfeiture is warranted under this provision "as transactions structured to evade reporting requirements, and as property traceable to any such violation or conspiracy." Am. Complaint ¶ 63.

### Summary

In accordance with the foregoing, the Complaint seeks forfeiture on the bases that the Defendant Funds (a) are proceeds of the sale of illegal narcotics; (b) are laundered drug money; (c) are, or are traceable to, bank deposits that were structured to avoid reporting requirements; and (d) were used in conducting an unlicensed money transmitter business.

As with the original Complaint, these claims are not supported by detailed factual allegations sufficient to support a reasonable belief that the Government will be able to meet its burden of proof at trial.

### IV. Detailed facts alleged – what the Complaint says, and what it does not

### A.     Narcotics trafficking

The Amended Complaint, like the original, includes repeated insinuations associating the Defendant Funds with drug trafficking. However – once again – there are no *factual* allegations supporting that connection.

In its Opinion and Order of June 30th ("Order") dismissing the original Complaint, the Court pointed out, *inter alia*, that

> The Government has pled no facts to support an inference that any of the Defendant Funds from the Account "represent[] the proceeds of some form of unlawful activity" that can be traced to identified narcotics or other criminal activity . . . .
>
> &ast;                &ast;                &ast;                &ast;
>
> Nor is there any allegation that peso broker Lema had connections to any narcotics, money laundering, or other criminal activity.
>
> &ast;                &ast;                &ast;                &ast;
>
> While the Complaint highlights that some peso brokers are in fact involved in the laundering of drug money, no facts are asserted to support an inference that Lema is such a broker or that the Defendant Funds derived from the drug trade or other unlawful activities.

Order pp. 17, 18, 20.

The Amended Complaint does not even attempt to rectify the Government's fundamental problem – that it has not made and apparently cannot make any allegation showing that the Defendant Funds can be traced to any identifiable drug-related transaction.

What the Amended Complaint does try to do, however, is "beef up" the allegations about currency exchanger Oscar Franco Lema in an attempt to create a reasonable *inference* that Franco deals in narcodollars. These added allegations are, like the insufficient allegations in the original Complaint, at best a basis for suspicion – perhaps a reasonable starting point for an investigation, but by no means an investigative endpoint indicating that there is any proof on which a judgment of forfeiture could properly be based.[2]

The new allegations on which the Government is now relying to show its likelihood of prevailing on the alleged connection between the Defendant Funds and narcotics transactions include:

> that some persons from whom deposits into the Mejía Cabals' HSBC Account were received gave Oscar Franco control over their checking accounts (¶¶ 9b. and c., 28);

> that funds were delivered to the HSBC Account from banks in Latvia on numerous occasions, and that "a number of DEA investigations have traced illegal drug funds to the Latvian banking system" (¶ 25);

> that "many" of the checks for pesos from the Mejía Cabals to Oscar Franco were endorsed by multiple payees, "a practice that indicates Franco operated on the BMPE" (¶ 32);

> that because Franco lives and works in Cali, Colombia, "a notorious drug region", "[i]t would have been virtually impossible for Franco to conduct informal foreign exchange operations of any magnitude in Cali . . . that did not involve drug proceeds" (¶ 33).

---

[2]    See Order p. 18: "This attempt to link the Defendant Funds, Claimants, and Lema to the BMPE process fails, however, where the Complaint is comprised of conclusory allegations that are insufficient 'to raise a right to relief above the speculative level.'"

These added allegations do nothing to show that the Government is likely to be able to demonstrate at trial a connection between the Defendant Funds and drug trafficking. Even if Franco did have control over other persons' checking accounts, that fact may show that the accountholders frequently sold dollars to Franco or persons for whom Franco was exchanging currency[3]; but it does not give rise to an inference that the dollars in the checking accounts came from drug transactions rather than from any number of other, legitimate sources. It is noteworthy that there is no allegation in the Complaint connecting any holder of a so-called "Third-party Individual Account" with any identifiable narcotics-related activity.

The Government's second point is likewise without merit as an indicator that the Government will be able to show a connection with drug trafficking at trial. It is utterly irrelevant for present purposes that a number of DEA investigations have traced illegal drug funds to the Latvian banking system.[4] What is relevant is that there are no allegations that any of the funds transferred from Latvian banks in this case can be traced to illegal drug transactions.

The third point - that checks written by the Mejía Cabals to Franco were endorsed by multiple payees, presumably after their receipt by Franco,– is utterly innocuous. The Government gleans from this fact that Franco "operated on the BMPE". If what is meant by BMPE is non-institutional currency exchange, of course he did. The issue is not whether he conducted currency exchanges, it is whether the source of the dollars was narcotics transactions.

---

[3]    If Franco dealt repeatedly with a finite pool of dollar providers, that fact would give rise to a reasonable inference that Franco wanted to control his risk by dealing with people whom he knew to be sources of clean dollars. That inference – in conjunction with the absence of any suggestion that Franco has ever been arrested or indicted for dealing in narcodollars – is certainly more reasonable than the inference that Franco was dealing in drug proceeds.

[4]    It would doubtlessly be equally true that a number of DEA investigations have traced illegal drug funds to the U.S. banking system, or to banks in New York – equally true, and equally irrelevant.

This point was explained quite clearly at page 20 of the Order, quoted at p. 6 supra ("While the Complaint highlights . . . .").

The fourth point – that Franco lives and works in Cali, Colombia, "a notorious drug region" – has no place in a serious complaint. In the Motion to Dismiss the original Complaint, Claimants argued (p. 9) that the implicit assumption at the heart of the Complaint was that the Government regards Franco's being a *Colombian* currency exchanger as proof enough of his being involved with drug proceeds. It is stunning that, rather than backing off its reliance on a derogatory stereotype to attempt to justify the sufficiency of its complaint, the Government in its Amended Complaint has merely localized the negative stereotype to a particular city in Colombia. Cali is (the Court may take judicial notice) a city of over two million people. Is the Government seriously suggesting that its residents can be stigmatized generally based on the operations of a drug trafficking subculture there? The fact that Franco resides in Cali is not in any way an allegation that shows a likelihood that the Government can meet its burden of proof at trial. To the contrary, the Government's reiterated appeal to bigotry is a fact that shows the Government's desperation in the absence of facts indicating it will prevail at trial.

In addition to these ineffectual "factual" additions, the Government has added to its Amended Complaint conclusory allegations which are crystallized in paragraph 22:

> The HSBC Account was funded almost entirely by funds laundered through the BMPE system, including dollars originating in the U.S. that were drug proceeds. Franco's movement of those funds into and out of the Franco, Third-party Business and Third-party Individual Accounts establishes that he is [a] money-laundering BMPE money broker, with connections to drug traffickers.

In the absence of detailed factual allegations to support any of these characterizations, the Amended Complaint is no more legally sufficient than was the original. Because the

Government's allegations supporting the claims that the Defendant Funds are drug proceeds are entirely conclusory, the claims regarding drug proceeds must again be dismissed. In the absence of any indication that a second opportunity to amend would yield factual allegations that have not yet been made, the dismissal should be with prejudice.

**Money Laundering**

As with the "drug proceeds" allegations, the new allegations regarding money laundering do not cure the problems that caused the original Complaint to be dismissed.

The new money laundering allegations do not so much involve new alleged facts as new characterizations – basically, that one aspect or another of Franco's conduct in carrying out the currency exchanges related to the Account is typical money laundering behavior. One example is in paragraph 23, which states in relevant part:

> The payment of dollars by third parties at the direction of a Colombian money broker is a hallmark of the BMPE's money laundering structure. There is no legitimate business reason for conducting foreign exchange transactions in this manner, other than to conceal the origin of funds.

Another such characterization is in paragraph 28, which states:

> Some of the Third-party Individual Accounts were held in the name of Colombian citizens who opened the U.S.-based accounts. The checkbooks from those accounts were sent to Franco in Colombia. This type of activity is consistent with the modus operandi of Colombian drug-money laundering organizations.

These allegations do nothing to show that the Government is likely to meet its burden of proof at trial.

The allegations in paragraph 23 attempt to distort logic through characterization. In an intermediated pesos-for-dollars exchange in which the person holding pesos is the initial buyer, the person agreeing to sell dollars *of course* delivers them at the direction of the intermediary.

The Amended Complaint offers no reason why this unremarkable behavior would be peculiar to drug-money exchanges.

No more compelling are the allegations in paragraph 28 that "some" individual account holders sent their checkbooks to Franco in Colombia. If we assume this is true, as for present purposes we must, this suggests (but does not show) that Franco may have had a certain amount of control over the funds in those accounts, and perhaps even that the persons holding those accounts used them for the specific purpose of participating in currency exchanges intermediated by Franco. However, the Amended Complaint offers no basis for constructing a chain of inferences from that point to "it was drug money", because the intermediate links in that chain are entirely absent.

In summary, the Government appears in the Amended Complaint to be trying to "cure" the money-laundering deficiencies in the original Complaint with a mere rhetorical gambit: take innocuous allegations that do not describe drug-related activity, and add an assertion that they are characteristic of drug-related activity. The Court should not permit the "detailed facts" requirement in Admiralty Rule G(2)(f) to be so easily and insubstantially circumvented.[5]

The Government clearly has no new facts to add to its money laundering allegations. Dismissal of the claims based on alleged money laundering should be with prejudice.

---

[5] Particularly ineffectual is the assertion that given behavior is "consistent with" drug-related activity. If a law clerk of this Court were to leave the courthouse today walking toward the subway with a well-stuffed briefcase, that behavior would be "consistent with" an intent to plant a bomb in a subway car. It would not, of course, be probative of such an intent.

**Structuring of deposits**

Perhaps the majority of the "new" factual allegations in the Amended Complaint revolve around the issue of structuring deposits to avoid bank reporting requirements.[6]

However, for as much as the new allegations buzz around the structuring issue they do not land on the flower.  The Amended Complaint, like its predecessor, does not get past innuendo to actual assertions that deposits were structured into the HSBC Account, or that deposits were structured into any Account from which funds were transferred to the HSBC Account.

With regard to the checks in pesos written by the Mejía Cabals to Oscar Franco Lema, the Amended Complaint goes to pains to point out that "[n]one of the checks exceeded 9,900,000 pesos, which is below the 10,000,000 peso threshold that triggers certain bank reporting requirements in Colombia."  But having gone to the brink of a structuring allegation, the Government is forced to recede in the next sentence, in which it admits that "the requirements apply to cash transactions, and not checks".  Undeterred by its acknowledgement that even checks worth over ten million pesos do not trigger the reporting requirement, the Government proceeds to try to create the impression of improper conduct even though it has just pulled the rug out from under its own conclusions:  "this structuring shows conscious effort by the Mejias to avoid government scrutiny of their monthly currency exchanges with Franco."  Apparently the Government's hope is that if it calls admittedly non-criminal behavior "structuring", the Court

---

[6]    Structuring includes "smurfing", the use of third persons to make the under-the-radar deposits.

will be sufficiently dazzled by the word choice to ignore the conceptual content of the allegations.[7]

The Government fares no better with its allegations about the deposits into the HSBC Account. In the Order, the Court points out that there were no allegations of structuring into the HSBC Account in the initial Complaint because "the checks cited in the Complaint were made out to 'one or both of the Mejia Cabals' and the Government does not allege that they were otherwise in such a form that title would pass upon delivery. Further, the Government does not allege that there were any transactions involving the cashing of the checks." Order p. 23 (footnotes omitted).

There is no significant change in the Amended Complaint, which still alleges that checks were deposited, in general on a monthly basis, into the HSBC Account, with no assertion that checks were cashed rather than deposited and no allegation that the checks were in a form pursuant to which title would pass upon delivery. Am. Complaint ¶ 9a. – c.

Moreover, the allegations of the Amended Complaint otherwise show that deposits into the HSBC Account were not structured in such a way as to avoid reporting requirements. The Amended Complaint states that Franco sent each month's group of checks together to HSBC, and that the typical monthly deposit was $20,000 (¶ 9a., c.). A deposit made in this way – if it were made in cash or a cash equivalent – would require the bank to issue a report. See 31 C.F.R. 103.22(c)(2) ("multiple currency transactions shall be treated as a single transaction if the

---

[7] Moreover, the Government appears to have it backwards – the fact that there were multiple checks appears to have attracted more scrutiny than a single check in the same amount would have. The same point applies to the allegations in paragraph 29 regarding Franco's deposit of multiple checks into the HSBC Account: if the combined amount had been deposited in a single check, the bank reporting requirement would not have been triggered; but the fact that the amount was deposited in multiple checks appears to have generated more scrutiny than a single check would have.

financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totaling more than $10,000 during any one business day").

Nevertheless, the Amended Complaint tries to create an *impression* of wrongdoing, in the absence of facts demonstrating that any structuring into the HSBC Account has occurred. In paragraph 27, for example, the Complaint describes a $20,000 monthly deposit consisting of two $5,000 checks from persons named Palau; a $4,000 check from Franco himself; and a $6,000 wire transfer from Franco. Because there was no cash deposit – and because the amounts were deposited in one bundle - there was no structuring; but even if the Palaus had deposited their $10,000 in one cash transaction and Franco his $10,000 in one cash transaction the bank reporting requirement would not have been triggered, because reporting is only required for deposits in excess of $10,000.[8]  See 31 C.F.R. 103.22(b).

No more effective are the allegations regarding the accounts from which funds were transferred into the HSBC Account ("the Source Accounts").

The main allegations regarding deposits into the Source Accounts are in paragraph 30. That paragraph begins with a generalized assertion that "the pattern of deposits into some of the Third Party Individual Accounts indicate [sic] that they were 'smurfing' accounts controlled by Franco." The paragraph then proceeds to describe an "example" involving three accounts with the following characteristics:

> The accounts were "funded in part with cash and money orders";

---

[8]    Both here and in the original Complaint the Government has chosen its "examples" of deposits into the HSBC Account to create the impression that most if not all were under $10,000. In fact there were about three dozen deposits in excess of $10,000, including several from Latvia. If Franco's intention was to "minimize law enforcement scrutiny" of activity in the HSBC Account, as is alleged in paragraph 29 of the Amended Complaint, his talents clearly lie in other fields.

14

The account holders are domiciled in Florida, but two of the accounts received deposits of money orders purchased with U.S. dollars at the same location in New York.

What is remarkable about these paltry allegations is what they tell us by omission: in the ten and a half months since the Defendant Funds were seized, the Government has not been able to turn up any information showing a pattern of cash deposits of $10,000 or less into any of the "at least 25" "Third-party Individual Accounts" or the "at least eighteen" "Third-party Business Accounts" referred to in the Amended Complaint (¶ 9b.). All they have to support a theory of smurfing into "some of" the Source Accounts is that two of those at least 43 accounts received deposits of money orders purchased in a state different from the accountholder's state of residence. The suggestion that these allegations support a reasonable belief that the Government will carry its burden of proof at trial is absurd.

In summary, there are no allegations in the Amended Complaint remotely supporting the notion that the Defendant Funds are property involved in a transaction structured to evade reporting requirements. All claims based on that theory should be dismissed – this time with prejudice.

**Illegal Money Transmitter**

The allegations supporting the Government's assertion that there was a violation of the laws requiring registration of money transmitters are stronger than the allegations purportedly supporting the three theories analyzed above. However, even these allegations raise questions about the portion of the Defendant Funds to which they apply.

In paragraph 7 the Amended Complaint alleges that "approximately $1,133,528 in checks and wire transfers was deposited into the HSBC Account" between June 2002 and September 10,

2007. Yet the amount seized is $1,399,313.74. The difference is over $265,000. It would appear that those funds are not subject to forfeiture for the money transmitter violations. To the extent they – and any other funds seized – are not, the operative complaint should so state.

Moreover, the Amended Complaint affirmatively indicates that another significant portion of the funds seized is <u>not</u> subject to forfeiture for the alleged money transmitter violation. There is no allegation that Oscar Franco Lema operated in the United States in the sense of contacting clients here or having an office or telephone here. His place of business is asserted to be Cali, Colombia, where he had contact with Claimant Iván Felipe Mejía Cabal, who also lives and works in Cali. His only contacts with the United States for present purposes appear to be that he had accounts in the United States – and possibly controlled others - that were used in connection with currency exchanges.

The U.S. checking accounts were – as is indicated in paragraph 7 of the Amended Complaint, quoted at page 15 <u>supra</u> – the source of only some of the funds deposited into the HSBC Account. Funds also came by wire transfer (<u>e.g.</u>, from banks in Latvia – <u>see</u> Am. Complaint ¶ 24). Because those funds did not go through Franco's U.S. accounts, the funds are not pertinent to any possible money transmitter violations.

This is so because pursuant to 18 U.S.C. § 1960(b)(1), there are three possible bases for a violation justifying forfeiture: that Franco was operating as a money transmitter in violation of registration requirements under the law of a U.S. state; that he failed to comply with registration requirements under 31 U.S.C. § 5330; and that Franco knew he was dealing with funds derived from or to be used to promote criminal activity. <u>See</u> Am. Complaint ¶¶ 57-58.

The Amended Complaint mentions only one state whose money transmitter registration laws Franco is alleged to have violated: Florida. Am. Complaint ¶ 35 ("Franco did not have a

license to operate as a money remitter in Florida"). But what Florida law requires is registration for money transmitter activity *in Florida*. See Sections 560.102(1) and 560.125(1), Florida Statutes (prohibiting unregistered persons from operating as money transmitter "in this state"). To the extent Franco, in Colombia, caused wire transfers to be sent to the HSBC Account in New York from anyplace other than Florida, that activity does not constitute a violation of Florida's Money Transmitters' Code, and thus does not serve as a basis for forfeiture under 18 U.S.C. § 1960(b)(1)(A) (unlicensed money transmitting business is one that is operated without appropriate money transmitting license in State where such operation is punishable as felony or misdemeanor).

Neither are all the Defendant Funds subject to forfeiture for lack of <u>federal</u> registration. Section 18 U.S.C. § 1960(b)(1)(B) states that an unlicensed money transmitting business is one that fails to comply with the registration requirements set forth in 31 U.S.C. § 5330. However, pursuant to 18 U.S.C. § 1960(b)(2), the term "money transmitting" includes transferring funds within this country or to locations abroad – but not into this country from locations abroad. Accordingly, the wire transfers from outside the United States to the HSBC Account also do not constitute a violation under this subsection.

The third possible basis for forfeiture under 18 U.S.C. § 1960(b)(1) is the operation of an unlicensed money transmitting business that transports funds known to the operator of the business to be derived from a criminal offense or to be used to promote or support unlawful activity. For the reasons explained <u>supra</u>, there are no colorable factual allegations in this Complaint connecting the Defendant Funds with such criminal activity.

For all the foregoing reasons, at best a portion of the Defendant Funds may be subject to forfeiture pursuant to 18 U.S.C. § 1960 as property involved in the conduct of an unlicensed

money transmitting business. The allegations in the Amended Complaint regarding forfeiture of funds related to violations of the money transmitter registration laws should be further amended to specify the amount subject to forfeiture on that basis.

WHEREFORE, Claimants IVAN FELIPE and CARLOS FERNANDO MEJIA CABAL hereby move for issuance of an order dismissing with prejudice all claims in the Amended Complaint based on theories that the Defendant Funds are connected with drug proceeds, money laundering, or structured deposits; dismissing without prejudice the claims based on alleged operation of an unlicensed money transmitter business, but with instructions that the claims be amended to exclude all amounts not constituting violations of the statutes governing unlicensed money transmitters; and granting such other relief as the Court deems just and proper.

Respectfully submitted,

/s/Alan Silber
Alan Silber (AS 2370)
Attorney for Claimants Iván Felipe Mejía Cabal
and Carlos Fernando Mejía Cabal

WALDER, HAYDEN & BROGAN, P.A.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 992 5300
asilber@whbesqs.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>v.<br><br>$1,399,313.74 IN UNITED STATES CURRENCY, FORMERLY ON DEPOSIT IN ACCOUNT NO. _____3844, IN THE NAME OF IVAN MEJIA CABAL AND CARLOS FERNANDO MEJIA CABAL, HELD AT HSBC BANK USA,NEW YORK<br><br>            Defendant *in rem*. | Civil case no. 08-CV-01993<br>Judge Scheindlin<br><br><br><br><br>**CERTIFICATE OF SERVICE** |

       I hereby certify that on August 4, 2008, I electronically filed a Memorandum of Law in Support of Motion to Dismiss the Amended Verified Complaint in the above captioned matter. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

Dated: August 4, 2008

                               /s/ Alan Silber_____
                               Alan Silber (AS 2370)

                               WALDER, HAYDEN & BROGAN, P.A.
                               5 Becker Farm Road
                               Roseland, New Jersey 07068
                               (973) 992 5300
                               asilber@whbesqs.com
                               Attorneys for Claimants Ivan Mejia Cabal
                               and Carlos Fernando Mejia Cabal.