UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                     :

UNITED STATES OF AMERICA,      :

                                     :

              Plaintiff,      :

                                   :

     - against -        :

                                   :

$1,399,313.74 IN UNITED STATES   :
CURRENCY, FORMERLY ON       :
DEPOSIT IN ACCOUNT NUMBER  :
___3844, IN THE NAME OF IVAN  :
MEJIA CABAL AND CARLOS     :
FERNANDO MEJIA CABAL, HELD AT :
HSBC BANK USA, NEW YORK,    :

                                   :

        Defendant in rem.    :

                                   :
------------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

USDC SDNY
DOCUMENT
ELECTRONICAL[...]
DOC #:
DATE FILED: _____

**OPINION AND ORDER**

**08 Civ. 1993 (SAS)**

## I.    INTRODUCTION

On February, 28, 2008, the Government filed a verified complaint for civil forfeiture in rem against $1,399,313.74 in funds (the "Defendant Funds") held in a personal savings account at HSBC Bank in New York (the "Account") in the names of Ivan Felipe Mejia Cabal and Carlos Fernando Mejia Cabal (collectively, "Claimants"). On June 30, 2008, I granted Claimants' motion to dismiss the complaint, with leave to replead, under Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rules G(5)(b) and G(8)(b)(i) of the Supplemental

Rules for Certain Admiralty and Maritime Claims (the "Supplemental Rules").[1]

On July 18, 2008, the Government filed an amended verified complaint, which

Claimants' now move to dismiss under Rule 12(b)(6) and the Supplemental Rules.

For the following reasons, the motion is granted.

## II.    BACKGROUND[2]

The Account is a personal savings account that was opened on or

about July 11, 2002 at HSBC Bank in New York.[3]  Claimants are the beneficial

owners and signatories on the Account.[4]  Claimants own and operate a container

manufacturing business located in Colombia.[5]  Claimants used the Account to

conduct monthly exchanges of U.S. dollars and Colombian pesos with peso broker

Oscar Franco Lema ("Lema").[6]  Claimants told investigators that the purpose of

---

[1]    *See United States v. $1,399,313.74 in U.S. Currency*, No. 08 Civ. 1993, 2008 WL 2605102 (S.D.N.Y. June 30, 2008) ("*Currency I*").

[2]    The following facts are drawn from the amended verified complaint ("complaint" or "Compl.") and are assumed to be true for purposes of this motion. There is significant overlap between the allegations in the amended and the original complaint.  For a more complete description of the factual allegations, see *Currency I*, 2008 WL 2605102, at *1-3.

[3]    *See* Compl. ¶¶ 13-14.

[4]    *See id.* ¶ 14.

[5]    *See id.* ¶ 16.

[6]    *See id.* ¶ 17.  The Government refers to Lema as "Franco."

the Account was to accumulate money to purchase an apartment in New York.

According to the amended complaint, "For decades, Columbian money brokers like Lema have provided a source of foreign exchange . . . to Colombian citizens engaged in international trade, or other Columbian citizens who, for other reasons, desired or needed access to foreign exchanges."[7] This unofficial currency trading system is known as the "Black Market Peso Exchange"(the "BMPE").[8] There are both legitimate and non-legitimate sources of funds that enter the BMPE. United States Dollars "that enter the BMPE in Colombia are derived from narcotics trafficking, capital flight, tourism, and the sale of . . . cigarettes, cattle, liquor and emeralds."[9] United States Dollars "that enter the BMPE in the United States are derived from narcotics trafficking or the repatriation of Columbian-owned funds back to Colombia."[10] "Colombians use the BMPE for currency exchanges for a number of reasons . . . [including] better exchange rates and avoiding tax and reporting requirements."[11]

In substance, the complaint alleges that Lema runs a large money

---

[7]   *Id.* ¶ 10.

[8]   *See id.* ¶¶ 6-12.

[9]   *Id.* ¶ 18.

[10]  *Id.*

[11]  *Id.* ¶ 17.

laundering business, which caters to narcotics traffickers. The complaint does not

allege specific facts connecting Lema, Claimants, or any of Lema's associates to

narcotics trafficking. Rather, the complaint draws the inference of narcotics

trafficking from two types of allegations. *First,* the Government argues that the

suspicious nature of the money transfers is indicative of BMPE transactions.

Several individuals purchased small money orders for third-party account holders,

the proceeds from which were transferred by Lema into the Account.[12]   The

Account was also funded by personal checks from at least twenty-five third-party

personal accounts and eighteen business accounts, many of which were controlled

by Lema.[13]   Many of the checks made payable to Lema from Claimants were

endorsed by multiple payees, a practice common to the BMPE.[14]   The

Government concludes that "[t]here is no legitimate business reason for

conducting foreign exchange transactions in this manner, other than to conceal the

origin of the funds."[15]

---

[12]    *Id.* ¶¶ 9, 16. The complaint refers to these individuals as "smurfs"; I will refer to them as "money transmitters."

[13]    *Id.* ¶ 9. The Government alleges that Lema has access to checkbooks from many of these accounts, which are registered in the names of Columbian nationals. *See id.* ¶ 15.

[14]    *Id.* ¶ 37.

[15]    *Id.* ¶ 23.

*Second*, the Government alleges that the vast majority of funds that transfer through the Columbian BMPE, and the Latvian banking system,[16] are derived from narcotics trafficking.[17]  In support of this contention, the Government alleges that: (a) a prominent 2004 investigation into money laundering led to the arrest of fifteen people by Colombian and Canadian officials and the forfeiture of twenty million dollars by an operator of a Columbian currency exchange;[18] (b) recent Columbian Government radio advertisements warned that the BMPE is often used to launder narcotics proceeds;[19] and (c) "a number of DEA investigations have traced illegal drug funds to the Latvian banking system."[20]

Like the first complaint, the amended complaint seeks forfeiture of

---

[16]    One allegation new to the amended complaint is that "a majority of the Third-party Business Accounts from which Franco [Lema] wired funds were held at Latvian banks."  *Id.* ¶ 25.  The complaint does not state, or estimate, what percentage of funds in the Account derived from Latvian Third-party Business Accounts.

[17]    *See id.* ¶¶ 18-20.

[18]    *See id.* ¶ 19.  Subsequent to these arrests, the Columbian Government ran advertisements warning against participation in the BMPE because it often promotes criminal activity.  *See id.* ¶ 21.

[19]    *See id.* ¶ 21.

[20]    *Id.* ¶ 25.  The Government also alleges, more broadly, that because "Cali, Colombia, where Franco resides, is a notorious drug region . . . it would have been virtually impossible for Franco to conduct informal foreign exchange operations of any magnitude in Cali . . . with foreign exchange originating from the U.S., that did not involve drug proceeds."  *Id.* ¶ 33.

Defendant Funds under 18 U.S.C. §§ 981(a)(1)(A) and 984, with underlying

violations of 18 U.S.C. §§ 1956 and 1957, and 31 U.S.C. § 5317.[21]  The amended

complaint adds one new theory of forfeiture: the claim for forfeiture under section

981(a)(1)(A) now also arises from alleged violations of 18 U.S.C. § 1960, which

prohibits unlicensed money transmitting businesses.  With respect to this new

claim, the complaint alleges that Lema failed to obtain a federal license or a

Florida license for his money transmitting business.  The complaint identifies two

transactions, totaling $12,000, that originated from Florida.

## III.   APPLICABLE LAW

The legal standards and applicable law were explained in *Currency*

*I*.[22]  All but two of the Government's forfeiture claims are premised, in part, on the

allegation that Defendant Funds derived from narcotics trafficking.[23]

The only new theory of forfeiture is that Defendant Funds derived

from Lema's unlicensed money transmitting business, in violation of 18 U.S.C. §

1960 and subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).  Section

981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a

---

[21]    *See Currency I*, 2008 WL 2605102, at *2.

[22]    *See id.* at *2-5.

[23]    *See id.* at *5-6.  The two exceptions are the structuring claim, *see id.*
at *6, and the unlicensed money transmitting business claim, discussed *infra*.

transaction or attempted transaction in violation of section . . . 1960 of this title or

any property traceable to such property."[24]  Section 1960 provides, in relevant

part:

> (a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.
>
> (b) As used in this section--
>
> (1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and--
>
>> (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;
>>
>> (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section;[25] or
>>
>> (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been

---

[24]     18 U.S.C. § 981(a)(1)(A).

[25]     *See* 31 U.S.C. § 5330(a)(1) ("Any person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury" not later than 180 days after the business opened).

derived from a criminal offense or are intended to be used to promote or support unlawful activity;

(2) the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier . . . .[26]

"Section 1960 was enacted in order to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises."[27]

## IV.  DISCUSSION

### A.    Narcotics Trafficking Claims

In its amended complaint, the Government again fails to allege any specific facts connecting Defendant Funds to narcotics trafficking.[28]   The

---

[26]    18 U.S.C. § 1960.  Section 1960(a) was amended in October 2001. Under the prior version of the statute, "the government was required to prove that the defendant had knowledge that the business was an illegal money transmitting business . . . .  Under § 1960(a) as amended, however, the government need prove only that the defendant had knowledge that the business was an unlicensed money transmitting business.  Accordingly, the government is no longer required to prove that he knew the money-transmitting business was illegal."  *United States v. Elfgeeh*, 515 F.3d 100, 132 (2d Cir. 2008) (quotations, citations and alterations omitted).

[27]    *United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999).

[28]    *See Currency I*, 2008 WL 2605102, at *6 ("While the Complaint highlights that some peso brokers are in fact involved in the laundering of drug money, no facts are asserted to support an inference that Lema is such a broker or that the Defendant Funds derived from the drug trade or other unlawful

principal new allegation in support of the narcotics-trafficking theory is that many

of the funds were sent from Latvia, which the Government asserts is a notorious

money laundering haven. This does not raise the right to relief above a

speculative level.[29]  Accordingly, the narcotics-trafficking claims are dismissed

under Rule 12(b)(6).[30]

---

activities.").

[29]    Although the pattern of transactions supports the conclusion that
Lema operated on the BMPE and attempted to conceal the origins of funds, the
Government makes no specific allegations in support of the conclusion that
concealing funds is particular to BMPE transactions involving narcotics
laundering, rather than to *every* type of transaction on the BMPE.  Thus, although
the suspicious pattern of transactions buttresses the Government's claim that Lema
operated on the BMPE, the Government's narcotics-trafficking theory ultimately
rests on the simple claim that the BMPE, in general, is frequently used to launder
narcotics proceeds.

[30]    To the extent the Government seeks relief on the theory that funds
transferred through the Latvian banking system are likely to have been derived
from narcotics laundering, the Government's claim may be non-justiciable in light
of the executive branch's exclusive dormant foreign relations power, as discussed
in *Zschernig v. Miller*, 389 U.S. 429 (1968) and *American Ins. Ass. v. Garamendi*,
539 U.S. 396 (2003).  In *Zschernig*, the Supreme Court invalidated a state law that
operated to prevent inheritance by citizens of Communist countries because "state
regulations must give way if they impair the effective exercise of the Nation's
foreign policy."  389 U.S. at 440.  If there are to be travel, probate, or other
restraints on citizens of Communist countries, the Court concluded, such restraints
"must be provided by the Federal Government."  *Id.* at 441.  Similarly, to the
extent the Government premises seizure on the theory that money transmitters are
more likely to be drug-laundering "smurfs" when they are Colombian, and account
holders in Latvian banks are more likely to hold narcotics-derived funds, this
Court is ill-equipped to make such broad assessments of foreign banking systems
and foreign nationals.  This type of wide-ranging foreign policy decision is best

The narcotics-trafficking claims are also dismissed under the Supplemental Rules. These claims rest on the theory that funds transferred through Latvian banks and the BMPE are likely to be criminally derived. The pleaded factual basis for this sweeping allegation is that some peso brokers, and some account holders in Latvian banks, are known to have laundered narcotics money. These pleadings are not sufficiently particular to permit Claimants to commence an investigation of the facts and to frame a responsive pleading, as required by the Supplemental Rules.[31] There is simply no way to investigate and respond to the allegation that Defendant Funds are criminally derived on the ground that they were exchanged on markets that are sometimes used to launder money, but which the Government acknowledges to have many legitimate uses.

### B.    Structuring Claim

The structuring claim under section 5317(c) is dismissed for the same reason it was dismissed in *Currency I*: the Government has not pleaded the existence of unreported *cash* deposits totaling over $10,000, in violation of the Bank Secrecy Act.[32]    Because every alleged deposit was made by money order,

---

made by the legislative or executive branches.

[31]    *See Currency I*, 2008 WL 2605102, at *2 (discussing Supplemental Rule E(2)(a)).

[32]    *See id.* at *7.

-10-

wire transfer or check, each indicating the payer and the payee, the deposits were not "monetary instruments" subject to the reporting laws.[33]  Hence, there was no structuring.

### C.    Unlicensed Money Transmitting Business

For purposes of this motion to dismiss, Claimants do not contest that Lema operated a money transmitting business, which he was required, but failed, to register with federal and Florida authorities.  Claimants contend, however, that the complaint is defective because it does not specify which of Defendant Funds are subject to forfeiture on this ground.  Claimants note that only two transactions are alleged to originate from Florida.  With respect to Lema's failure to register with federal authorities, Claimants argue that section 1960(b)(2) subjects to forfeiture only those funds transferred within this country or to locations abroad, but not funds transferred into this country from locations abroad.  Because many of Defendant Funds were transferred from abroad, Claimants ask the Government to clarify, in an amended pleading, which of Defendant Funds are subject to forfeiture under 1960(b)(2).  Because the Government makes no meaningful effort to respond to these arguments, and appears to agree with Claimants' understanding

---

[33]    *See id.*

-11-

of section 1960(b)(2),[34] I dismiss the section 1960 claim with leave to replead, in

order to specify which of Defendant Funds are allegedly subject to forfeiture under

section 1960.

## V. CONCLUSION

For the reasons set forth above, Claimants' motion to dismiss the

Complaint is granted with leave to replead only the section 1960 claim within

twenty days of this Opinion and Order. The Clerk of the Court is directed to close

this motion [docket no. 26].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           November 17, 2008

---

[34]     *See* Goverment's Memorandum of Law in Opposition to Claimants'
Motion to Dismiss the Amended Verified Complaint, at 23 ("Any such transfers
that Franco made *from U.S. banks* also were made in violation of 18 U.S.C. §
1960(b)(1)(B), as he was not registered with [the federal authorities]." (emphasis
added)).

-12-

## - Appearances -

### For the United States of America:

Sharon E. Frase
Assistant United States Attorney
United States Attorney's Office
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2329

### For Defendant in rem:

Alan Silber, Esq.
Walder, Hayden & Brogan, P.A.
5 Becker Farm Road
Roseland, NJ 07068
(973) 992-5300